**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNA LEE STAINTHORP,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:13-cv-01874-GSA<br><br>**ORDER ON PLAINTIFF'S COMPLAINT**<br><br>(Doc. No. 17) |

## I. INTRODUCTION

Plaintiff, Donna Lee Stainthorp ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 8.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on September 3, 1964, and alleges disability beginning on February 5, 2010. (AR 135-45; 164-73.) Plaintiff claims she is disabled due to anxiety, depression, post-traumatic stress disorder, panic attacks, back pain, and degenerative disk disease. (*See* AR 165.)

**A.   Relevant Medical Evidence**

   **1.   Imaging Studies**

A Magnetic Resonance Imaging (MRI) study of Plaintiff's cervical spine on July 9, 2007, revealed minimal bulging at C3-4, bulging disc with superimposed left central disc protrusion at C4-5, left central disc protrusion measuring approximately 3 mm in AP diameter and disc material abutting the anterior surface of the cord without frank cord compression at C5-6, and an oval hyperintensity in the region of the right thyroid gland. (AR 251.) Imaging of Plaintiff's abdomen and pelvis on August 3, 2008, revealed multiple bilateral endometriomas and circumferential thickening of the cecum. (AR 259.) Imaging of Plaintiff's thoracic spine on October 7, 2008, showed normal posterior alignment of the thoracic vertebra with mild degenerative changes. (AR 247.) Imaging of the cervical spine on February 10, 2009, after a cervical facet joint injection at C3-4, C4-5, and C5-6 bilaterally, reflected the placement of small metallic needs on both sides of the mid and lower neck. (AR 252-53.) On December 17, 2009, axial imaging of Plaintiff's sinuses indicated mucosal sinus disease involving the sphenoid sinus. (AR 699-700.)

An imaging study of Plaintiff's paranasal sinuses on March 10, 2011, revealed minimal sinus disease and evidence of mucosal thickening involving the floor of the right maxillary sinus and left side of the sphenoid sinus. (AR 501.) An MRI study of Plaintiff's cervical spine on November 19, 2011, revealed a discrete 4.7 mm left paracentral disc protrusion encroaching upon and possibly touching the ventral surface of the spinal cord at C5-6, a subtle 3 mm broad-based lobulated sic bulge with bilateral paracentral components and some encroachment on the ventral surface of the spinal cord, and mild multilevel degenerative changes consistent with Plaintiff's age. (AR 706-07; 711-12.) An MRI study of Plaintiff's lumbar spine on May 1, 2012, revealed mild degenerative changes, a 3 mm left paracentral disc bulge at L4-5 effacing and compressing the left ventral surface of the thecal sac, as well as narrowing the left neural foramen and

encroaching upon the left L4 or L5 nerve root, mild bilateral neural foraminal and lateral recess stenosis at the L5-S1 level, and a subtle 2 mm disc bulge at the L5-S1 level associated with compression of the thecal sac and encroachment upon both of the exiting nerve roots.  (AR 702-03.)

### 2. Northwest Medical Group

On July 7, 2008, Plaintiff was seen for a physical examination and was not wearing her prescribed brace for carpal tunnel syndrome, contrary to her physician's instructions, and to have her migraine symptoms under control.  (AR 284.)

On February 18, 2009, Plaintiff was seen at Northwest Medical Group ("Northwest") for follow up.  (AR 279-80.)  MA Teresa Vinton noted that Plaintiff appears "unhappy" and "angry," and that Plaintiff

> . . . had a hysterectomy in September [of 2008] and has been feeling depressed and tired all the time.  She is on Premarin feels that [she] has no energy, cries all the time, finds is hard to focus at work, even her husband is noticing a change.

(AR 279.)  On April 7, 2009, Plaintiff was seen at Northwest for a follow-up after going to urgent care for a panic attack four days prior, where she was seen for chest tightness and dizziness.  (AR 272-74.)  She reported that she

> . . . left her work and went to the ER . . . and was seen for her condition.  They did some EKGs and lab work and everything turned out to be normal[.]  She fears that she will lose her job.  States her b[o]ss harasses her a lot.  She needs a note regarding her condition.

(AR 272.)  On September 2, 2009, Plaintiff was again seen for a physical examination, and MA Anna Bay-Moorhead noted that she had "been having problems at work" and "hired a lawyer and [wa]s suing her work for discriminating about her age."  (AR 268.)  On October 28, 2009, Plaintiff was seen at Northwest due to a diffusely swollen, erythematous right knee with observed patellar tenderness.  (AR 267.)  On November 2, 2009, Plaintiff went to Northwest complaining of pain in her bilateral calves and cramping in her feet, diarrhea, weakness, and headache.  (AR 263-65.)

### 3. Ear, Nose, and Throat Consultations

Martin Wenthe, M.D., performed a tempromandibular joint apparatus dysfunction consultation on April 1, 2009, after Plaintiff complained of jaw pain, dizziness, lightheadedness,

3

ear pain and ringing/buzzing, pain while eating, and frequent headaches. (AR 277-78.) He observed that "the sensitivity of the middle one-third of [her] face is compromised on both sides," and Plaintiff had a "limited" range of mandibular motion opening. (AR 277.) She had "moderate crepitation during opening, and early click upon opening." (AR 277.) "Palpation elicited a pain response," and Dr. Wenthe found her symptoms consistent "with a diagnosis of Otalgia, the late effects of a sprain and strain, Traumatic Arthropathy, and traumatically induced synovitis (bilateral TMJ)." (AR 278.)

Michael J. Yoo, M.D., performed a sinus consultation on December 3, 2009, on referral from Dr. Wenthe. (AR 291-93.) Plaintiff complained of "problems with [her] sinuses always running, dry mouth, [and] bad taste in [her] mouth." (AR 291.) She reported constant "pressure all over her face" and being unable to "smell anything[.]" (AR 291.) Dr. Yoo assessed Plaintiff as having "chronic rhinitis, secondary to cigarette smoking as well as laryngopharyngeal reflux." (AR 292.)

**4. Pain Management**

Plaintiff was seen by PA-C William Johncox and Berj T. Kalamkarian, M.D., at the San Joaquin Center for Pain Management beginning April 21, 2008. (AR 294-316.) On April 21, 2008, she reported chronic neck and upper back pain, noting particular pain on left rotation. (AR 315.) She was assessed as suffering from degenerative disc disease of the cervical spine, chronic neck pain, upper extremity numbness and tingling, and thoracic spine pain, and was not recommended for cervical facet blocks, despite past success in managing her pain. (AR 315.) On May 20, 2008, Plaintiff requested facet blocks due to ongoing neck pain, and reported that "[h]er medications increase her activities of daily living" and that "[s]he is more functional and can work more comfortably with them." (AR 313.)

On July 8, 2008, Plaintiff reported neck pain at a 4 out of 10 (AR 312), and on September 16, 2008, she reported the same pain level but noted that her mid-back was particularly bothersome post-hysterectomy (AR 310). On September 16 and November 10, 2008, Plaintiff also reported that her neck pain had improved because she has not been working as much, "using her shoulders and arms to pour drinks and do her usual and customary work duties." (AR 308,

310.) On December 9, 2008, Plaintiff reported she was taking extra shifts at work, and her arms had "become quite sore and aching because of it." (AR 306.) In contrast, during the two months she did not work after her hysterectomy, her "arm pain was essentially minimal[,]" though she continued to have neck pain radiating through her left shoulder. (AR 306.) Plaintiff reported her "medication takes the edge off of her pain and helps with her activities of daily living, and with it, she can function and get though her work day." (AR 306.)

On January 21, 2009, Plaintiff reported increased neck pain due to tension. (AR 304.) On March 3, 2009, Plaintiff reported that the cervical facet joint blocks injected from C3-6 bilaterally on December 10, 2008, had "helped greatly for the first two weeks" and she continued to feel "about 65 percent better, although she feels little by little the effects are wearing off." (AR 302.) On March 30, 2009, Plaintiff reported pain at a 5 out of 10 (AR 301), and on June 16, 2009, Plaintiff reported ongoing neck and shoulder pain at a 4 out of 10 (AR 300).

Plaintiff complained of pain at 7 out of 10 on June 29, 2009, as well as numbness in the right fourth digit proximal phalanx. (AR 299.) She was given a Toradol injection to help with her pain, and ice/heat was recommended. (AR 299.) On July 23 and August 20, 2009, Plaintiff reported ongoing stress and stable symptoms (AR 297-98), and on October 29, 2009, Plaintiff reported increased neck pain from lifting the baby she had adopted (AR 296). Plaintiff was seen on December 30, 2009, and reported pain of 4 out of 10 (AR 295), and on March 3, 2010, she reported pain at 7 out of 10 and though after four months off work she was "feeling better overall," she reported increased neck pain from lifting the baby (AR 294.) On May 3, 2010, Plaintiff reported neck pain radiating to the left trapezius at a 3 out of 10, some ear and jaw popping, and increased pain from lifting the 25-pound baby. (AR 317.)

**5.    Short-Form Evaluations for Mental Disorders**

On May 12, 2009, Sam A. Castro, M.D., evaluated Plaintiff's mental state and panic disorder. (AR 319-21; 349-51.) He observed Plaintiff to be well-groomed but agitated, with loud, rapid, and pressured speech and irritable, aggressive, and manipulative behavior. (AR 319; 349.) Her concentration and judgment were mildly impaired, and she exhibited content-delusions of persecution and content-preoccupations of phobias and obsessions. (AR 319-20; 349-50.) Dr.

5

Castro assessed Plaintiff's prognosis as poor, and opined that her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms or to respond appropriately to changes in a work setting was poor. (AR 321; 351.) While his assessment was very limiting, Dr. Castro's evaluation was not accompanied by any treatment records.

### 6. State Agency Physician Consultations

L. Bobba, M.D., evaluated Plaintiff on July 12, 2010, opining that Plaintiff could occasionally lift/carry up to 20 pounds and frequently lift/carry up to 10 pounds, could stand/walk/sit about 6 hours in an 8-hour workday, and had no limitations in pushing, pulling, handling, fingering, or feeling. (AR 323-24.) She was limited in her ability to reach in all directions, including overhead, and could only occasionally climb ladders or crawl, but could frequently climb stairs, stoop, kneel, or crouch. (AR 324.)

Nicole Lazorwitz, Psy. D., evaluated Plaintiff on August 18, 2010, opining that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact with the general public or coworkers, and accept instructions and respond appropriately to criticism. (AR 328-29.) Plaintiff was also moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and moderately limited in her ability to respond appropriately to changes in the work setting. (AR 329.) Dr. Lazorwitz opined that plaintiff "is able to carry out simple instructions, follow simple work-like procedures, and make simple work-related decisions." (AR 330.)

Dr. Lazorwitz also completed a Psychiatric Review Technique form, noting that Plaintiff suffered from affective, anxiety, and depressive disorders. (AR 332-45.) Plaintiff exhibited moderate difficulties in maintaining social function and in maintaining concentration, persistence, and pace, mild restrictions in her activities of daily living, and no episodes of decompensation. (AR 342.) Dr. Lazorwitz opined that Plaintiff "appears mostly credible" but the "alleged severity of [her symptoms] is not fully supported" by the medical record. (AR 344.)

//

### 7. Other Medical Records

Plaintiff was seen by Saji T. John on June 17, 2010, at Kaiser Permanente Main Campus, for "form completion." (AR 363.) She reported a history of depression, hypertension, and anxiety, and complained of chronic neck and back pain and hot flashes. (AR 363-64.) Plaintiff had a tonsillectomy on July 15, 2011, at Kaiser Permanente Hospital, for her chronic halitosis and recurrent "tonsilliths" (tonsil stones). (AR 624-26.)

Plaintiff was admitted to Community Regional Medical Center on December 15, 2011, complaining of headache, palpitations, diffuse body aches, chills, and diarrhea. (AR 739-56.) She was discharged on December 17, 2011, with prescriptions for Wellbutrin, Premarin, Pravachol, Zoloft, Prilosec, Xanax, Hydrocodone-Acetaminophen, and Lopressor. (AR 740-41.) Plaintiff was seen by Than A. Aw, M.D., for chronic neck and back pain, depression, anxiety and palpitations, hypertension, nasal congestion, and fibromyalgia on January 4, 2012, and to design a plan for managed care. (AR 723.) On January 19, 2012, Dr. Aw saw Plaintiff again, and coached her on energy release protocols to deal with stress and past actions, reduce triggers, and "transform and nourish/re-direct to nourish" her "spirit/soul." (AR 723.) On January 31, 2012, Plaintiff complained of lower back pain but reported being "Ok" with her current pain medication combination of Norco and Tramadol. (AR 719.)

In an untitled assessment on November 19, 2012, Dr. Aw opined that Plaintiff was limited to occasional postural activities, and could only occasionally lift or carry up to ten pounds. (AR 761.)

**B.   Testimony**

### 1. Adult Function Report and Work History Report by Plaintiff

Plaintiff completed an adult function report on June 21, 2010, noting that on an average day she wakes up, takes care of her foster son and pets, cooks breakfast, cleans her house, sometimes goes out "if [she] really ha[s] to," cooks dinner, takes her medication, and then goes to bed. (AR 182-83, 184.) She has "bad nightmares" and will "wake up screaming some nights[,]" and since the onset of her symptoms she is unable to "laugh, go out and have fun," talk on the phone, make jewelry, or "liv[e] life." (AR 183.)

1    Plaintiff described her past employment as a server and bartender as averaging 8-hour
2 shifts of walking, standing, reaching, and grasping, with thirty-minutes of kneeling and crouching.
3 (AR 191-93.)  She lifted up to 30 pounds when she would move beer kegs, but most frequently
4 moved less than 10 pounds.  (AR 191-93.)

5    Plaintiff completed a second, undated and unsigned, adult function report, noting that on
6 the average day it takes her 20 minutes to "get up" after taking her medication, after which she
7 "tr[ies] to get through[ ] the day without being so depressed" and describes herself as "a walking
8 robot[.]"  (AR 220.)  She takes care of her son "sometimes, most of the time [she] cr[ies] when
9 [she's] alone."  (AR 220.)  She will scream and talk in her sleep, and wakes up several times a
10 night. (AR 221.)  When she leaves the house alone, she has panic attacks.  (AR 223.)  Due to her
11 panic attacks, Plaintiff "can't be around to[o] many people[.]"  (AR 225.)  She noted no
12 restrictions in her ability to lift, squat, bend, stand, reach, walk, sit, or kneel, but did note
13 difficulties with talking, memory, completing tasks, concentration, understanding and following
14 directions, and getting along with others.  (AR 225.)

15    **2.    Adult Function Reports by Greg Stainthorp**

16    Plaintiff's husband Greg Stainthorp completed a third-party adult function report on May
17 27, 2010, noting that he had known Plaintiff for 19 years and spent approximately 16 hours a day
18 with her.  (AR 174.)  Mr. Stainthorp stated Plaintiff takes care of their son and pets, cleans their
19 home, does some laundry, and cooks.  (AR 174-76.)  She does "not spend[ ] very much time with
20 people outside home" and is no longer able to "work with co-workers / interact with people / do
21 physical [work]."  (AR 174-75.)  Plaintiff "wakes up worrying about [her] inability to perform
22 normal life / hurting, neck & back[,]" but does not have any problems with her personal care.
23 (AR 175.)  She leaves the house 2-3 days a week, drives a car, and goes shopping 2-3 days a
24 week. (AR 177.)  Mr. Stainthorp notes that Plaintiff's "family has problems and drama" and she
25 "can't be around them."  (AR 179.)  Finally, he stated that "20 lbs of lifting hurts" Plaintiff, her
26 "bending range of motion [is] not 100%" and "reaching gives [her] pain when raised above [her]
27 head." (AR 179.)

28 //

Mr. Stainthorp completed a second third-party adult function report on January 27, 2011, noting that he has known Plaintiff for 18 years and spends half of each day with her. (AR 212.) On an average day, Plaintiff feeds, dresses, and plays with their son, does laundry, lets the pets outside, and watches television. (AR 212-13.) She suffers from nightmares and restlessness when trying to sleep, and wakes up repeatedly. (AR 213.) Since the onset of her symptoms, Plaintiff "will not choose to go do visits or activities." (AR 217.)

Mr. Stainthorp concludes that Plaintiff "has changed since being mistreated" by a "boss" at her old job, and as a result, she "[l]ost [her] confidence to be around people and ability to perform to her standard of [excellence]." (AR 219.) In a letter dated February 3, 2012, Mr. Stainthorp stated that Plaintiff "doesn't feel confident around a lot of people like she used to . . . because of her constant pain she feels less of a person sometimes staying in bed for long periods of time." (AR 244.) He also notes that Plaintiff needs better "care" to improve, and does "not hav[e] good ins[urance] anymore[.]" (AR 244.)

**C.    Administrative Hearing**

    **1.    Plaintiff's Testimony**

During the administrative hearing on May 8, 2012, Plaintiff was accompanied by counsel and testified that she suffered from recurrent depression, severe anxiety, back pain associated with leg numbness, headaches, and pain radiating down her neck to her left shoulder. (AR 34-35; 37-39; 42.) She testified that she is on a Fentanyl patch, 25 milligrams, and takes Norco and Soma for her pain. (AR 39.) She also uses a TNS unit on her back and neck, and applies ice and heat. (AR 39.) She is right-handed. (AR 32.) Plaintiff testified that her doctor recommended she see a surgeon for her back, but "basically [her doctor] said there's really nothing a surgeon can do[.]" (AR 39.) She sees a doctor for pain management. (AR 51.)

Plaintiff testified that she had last worked as a waitress and a bartender, and stopped working February 5, 2010. (AR 36-37.) She quit work due to her "severe anxiety" which caused a panic attack for which she was hospitalized. (AR 42.) Without her medication, Plaintiff testified that she "could have [a panic attack] almost everyday" and has "severe nightmares." (AR 42-43.) She takes naps during the day to "shut [her] mind down because there's just so much

9

stuff going on in [her] head that [she] just want[s] to forget about it and go to sleep[.]" (AR 45.) She has trouble shopping, and has experienced panic attacks "on numerous occasions" while shopping. (AR 46-47.) Her memory is "not very good at all" and she relies on her husband to manage finances for the family. (AR 43.) She has been depressed "for quite some time, and it's getting to the point where [she does]n't like to be around people at all." (AR 42.) About twice a month, she is unable to get out of bed for two to three days at a time, even with her medications. (AR 48.) She has suicidal thoughts on a daily basis. (AR 50.)

Plaintiff stated that she had limitations in standing, walking, sitting, bending over, and climbing stairs. (AR 41.) She can lift her arms over her head (AR 41), but has difficulty twisting at the waist and picking up groceries (AR 51-52).

### 2. Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a hypothetical person of Plaintiff's age, education, prior work experience, and the Residual Functional Capacity ("RFC") to "lift and carry 20 pounds occasionally, 10 pounds frequently, sit, stand or walk six [hours out of an 8-hour workday], with occasional crawling, climbing ladders, ropes and scaffolds and overhead reaching. And frequent stoop, crouch, climb and balance and also simple, routine tasks and occasional public contact." (AR 54.) The VE testified that as those jobs were defined in the Dictionary of Occupational Titles ("DOT"), Plaintiff could not perform any past relevant work as a bartender or waitress, but could perform other light work, as a price marker, DOT code 290.587-034, mail clerk/sorter, DOT code 209.687-026, or as a routing clerk, DOT code 222.587-038, all defined as light work with an SVP:2.[2] (AR 54.)

The ALJ then asked the VE to consider a second hypothetical, with the same "20 and 10, sit, stand or walk six" limitations as the first hypothetical, with "occasional" postural limitations to stoop, crouch, crawl, climb, balance, and reach overhead, and limitations to simple, routine tasks, and occasional public contact and worker contact in the same building. (AR 54-55.) The VE testified that based on these limitations, jobs as a price marker and routing clerk would be subject

---

[2] Specific Vocational Preparation ("SVP"), as defined in Appendix C of the Dictionary of Occupational Titles, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

to erosion of the work base, to eliminate frequent postural activities and working side-by-side with coworkers. (AR 55.)

The ALJ then asked the VE to use the same limitations as the second hypothetical, with the addition that "this person is going to be unable to concentrate for more than an hour and would likely miss about four days a month." (AR 55.) The VE testified that based on these limitations, Plaintiff could not perform any work. (AR 56.)

The ALJ finally asked the VE to assume an individual limited to "a light RFC, and this individual had a poor ability to complete a normal workday and work week without interruptions from psychologically based symptoms and a poor ability to respond appropriately to changes in a work setting[.]" (AR 56 (defining "poor" to mean "the evidence supports the conclusion that the individual cannot usually perform or sustain the activity.").) The VE testified that based on these limitations, Plaintiff could not perform any work. (AR 56.)

**C.    Administrative Proceedings**

On June 22, 2012, the ALJ issued a decision and determined Plaintiff was not disabled. (AR 13-22.) The ALJ found that Plaintiff had severe impairments including cervical and lumbar degenerative disc and joint disease, chronic pain syndrome, anxiety, and depression. (AR 15.) The ALJ determined these impairments did not meet or equal a listed impairment. (AR 15-17.) The ALJ found Plaintiff retained the RFC "to lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand, and/or walk 6 hours each in an 8-hour day. She can occasionally stoop, crouch, crawl, climb, balance, and reach overhead. She can perform simple and routine tasks with occasional contact with the public and with coworkers defined as the ability to work in the same building, but not work side-by-side (20 CFR 404.1567(b) and 416.967(b))." (AR 17.)

Given this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work. (AR 20.) After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy she could perform, including work as a price marker, mail sorter, and routing clerk. (AR 21.) The ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, from October 10, 2009, the alleged onset date, to the date of the decision. (AR 22.)

**D.     Plaintiff's Complaint**

On August 14, 2014, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff argues that the ALJ erred by deviating from the DOT without securing a sufficient explanation from the VE. (Docs. 14, 5-11.)

### III.   SCOPE OF REVIEW

The Commissioner's decision that a claimant is not disabled will be upheld by a district court if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d 323, 325 (9th Cir.1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.) Substantial evidence is more than a mere scintilla, but less than a preponderance. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.") The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

//

12

The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.2001) (citations omitted); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."); *see Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive). The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

### IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

//

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled. *Id.* §§ 404.1520(d), 416.920(d). If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

**A.   The ALJ Erred by Relying on Vocational Testimony that was Inconsistent with the Dictionary of Occupational Titles**

Plaintiff argues the VE's testimony was inconsistent with the DOT, and the ALJ erred by failing to identify and obtain a reasonable basis for the VE's deviation from the DOT and its companion publications. (Doc. 14, 5-11.) The Commissioner responds that the testimony was not inconsistent because there was no conflict and the VE adequately distinguished the availability of jobs with the imposed limitation to occasional overhead reaching. (Doc. 16, 5.)

**1.   Legal Standard**

In determining whether appropriate jobs exist for the claimant, the ALJ generally will refer to the DOT. *Light v. Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997). The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on a vocational expert's testimony, particularly in cases where the expert's testimony conflicts with the DOT. In

making disability determinations, the ALJ may rely on VE testimony that contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation. *Light*, 119 F.3d at 793; *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995); *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). Although evidence provided by a VE "generally should be consistent" with the DOT, "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict." SSR 00-4p at *2. Thus, the ALJ must first determine whether a conflict exists, and if it does, must then determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the DOT. *Id.* at *2-3.

Only after determining whether the VE has deviated from the DOT, and whether any deviation is reasonable, can an ALJ properly rely on the VE's testimony as substantial evidence to support a disability determination. *Massachi*, 486 F.3d at 1152-54. Evidence sufficient to support a deviation from the DOT may be either specific findings of fact regarding plaintiff's ability to perform particular jobs, or inferences drawn from the context of the expert's testimony. *See Light*, *supra* at 1435 n.7 (ALJ provided sufficient support for deviation by noting that the VE described characteristics and requirements of jobs in the local area consistent with claimant's RFC); *Terry v. Sullivan*, 903 F.2d 1273, 1279 (9th Cir. 1990) (ALJ may infer support for deviation where VE's understanding of applicable legal standards is clear from context).

**2.   The ALJ Did Not Ask Whether the VE's Testimony Was Inconsistent with the DOT, or, Whether There Was a Reasonable Explanation for the Conflict**

SSR 00-4p explicitly requires that the ALJ determine whether the expert's testimony deviates from the DOT, and whether there is a reasonable explanation for any deviation. At the hearing, the ALJ did not ask whether the VE's opinions were consistent with the DOT, and, if so, whether there was a reasonable explanation for the conflict. (AR 53-56.) Although the VE was not providing evidence about the "requirements of a job" by stating Plaintiff was qualified for certain jobs in response to the ALJ's hypothetical question, the VE was indirectly providing such evidence. *See* SSR 00–4p at *4 (stating that an ALJ must inquire whether a VE's testimony regarding "the requirements of a job or occupation" conflicts with the DOT). Specifically, the VE testified that Plaintiff was capable of performing jobs that all require frequent or constant

15

reaching, despite the ALJ's finding that Plaintiff is capable of performing only occasional overhead reaching. Thus, the ALJ erred in failing to ask whether the VE's opinions were consistent with the DOT.

### 3. The VE's Testimony Was Inconsistent with the DOT and No Reasonable Explanation for the Conflict was Offered

Unless the VE's testimony actually conflicts with the DOT, by itself the ALJ's failure to explicitly ask whether the VE's testimony was consistent with the DOT is not enough to warrant reversal. *Massachi*, 486 F.3d at 1151 n.19, 1152-53 (failure to ask whether the VE's testimony is consistent with the DOT is harmless procedural error where there is no actual conflict, or the VE has provided sufficient support for her conclusion so as to justify any potential conflicts). The Commissioner argues there was no conflict between the VE's testimony and the DOT because the DOT listings do not separate out "overhead reaching" from the "broader category that includes all types of reaching." (Doc. 16, 5.) The Commissioner further contends there was no conflict because "the VE simply provided more detailed information about the requirements of jobs within each occupation." (Doc. 17, 6.)

Within the meaning of the DOT, "reaching" is defined as "[e]xtending hand(s) and arm(s) in *any* direction." Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), Appendix C (1993) (emphasis added). Here, the jobs identified by the VE require "frequent" or "constant" reaching. *See* DOT 209.587-034, 209.687-026, 222.587-038. When considered in light of the SCO and DOT, these jobs plainly conflict with Plaintiff's limitation of only "occasional overhead reaching," because "overhead reaching is a specific subset of reaching." *See Carpenter v. Colvin*, No. 1:13-CV-00984-SKO, 2014 WL 4795037, at *8 (E.D. Cal. Sept. 25, 2014); *see also Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014); *Pacheco v. Astrue*, No. EDCV 09-1063-CW, 2010 WL 3488215, at *5 (C.D. Cal. Aug. 31, 2010); *Silvera v. Astrue*, No. CV 09-1935-JC, 2010 WL 3001619, at *3 (C.D. Cal. July 29, 2010) (citing *Marshall v. Astrue*, 2010 WL 841252, at *6 (S.D.Cal. Mar.10, 2010)), *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). As a result, there was a potential conflict between the VE's testimony about jobs Plaintiff could perform and the DOT description of those jobs, and an

16

explanation of that deviation was therefore necessary. *Carpenter*, 2014 WL 4795037, at *8 (testimony that a claimant limited to occasional overhead reaching can nonetheless perform frequent reaching is the exact type of deviation that should be resolved by explanation from the VE) (citing *Winder v. Astrue*, No. 12-CV-1048, 2013 WL 489611 at *2 (C.D. Cal. Feb. 6, 2013) (same); *Richardson v. Astrue*, 11-CV-1593-SP, 2012 WL 1425130, at *4 (C.D. Cal. Apr. 25, 2012) (reaching in "any" direction plainly encompasses overhead reaching, therefore VE's testimony deviated from DOT and the ALJ was required to obtain "persuasive evidence" to explain the deviation)).

The ALJ included in his second hypothetical the limitation that the Plaintiff was limited to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit, stand or walk only 6 hours each within an 8-hour day, and to "stoop, crouch, crawl, climb, balance, [and] reach overhead" only occasionally, as well as being limited to simple, routine tasks, and only occasional public and occasional worker contact within in the same building. (AR 54-55.) In response, the VE went through each title as defined in the DOT within the three categories of jobs she had presented in response to the first hypothetical: price marker, routing clerk, and mail clerk. (AR 55.)

Under the constraints of "occasional" postural limitations, the VE eliminated one of five titles within the "price marker" category. (AR 55.) She then eliminated a second title within the "marker" category due to Plaintiff's "coworker contact" limitation, thereby eroding the job base to leave only "14,237" "marker" positions in California. (AR 55.) Similarly, one of the seven titles within the "routing clerk" category would be eliminated due to "frequent postural" job requirements, and three other titles within the category were eliminated by Plaintiff's public and coworker contact limitations. (AR 55.) The VE testified that as a result of this erosion of the job base, only "12,854" "routing clerk" positions remained in California. (AR 55.)

However, when the VE reviewed the requirements of "mail clerk," she testified that the category would *not* be subject to reduction due to either the postural or public/coworker contact limitations. (AR 55.) This is inconsistent with the DOT definition of "mail clerk," which indicates "Reaching: Frequently – Exists from 1/3 to 2/3 of the time." DOT 209.687-026. Despite stating that "[p]ursuant to SSR 00-4p, [he had] determined that the [VE]'s testimony is consistent

with the information contained in the [DOT]" (AR 22), the ALJ did not explain the conflict or offer a basis for relying on the VE's testimony rather than the DOT.

Absent a determination that the VE's explanation for the conflict was reasonable and a basis exists for relying on the VE's conclusions rather than on the DOT, an ALJ cannot properly rely on the VE's testimony as substantial evidence to support a disability determination. *Massachi*, 486 F.3d at 1152-54; *see* SSR 00-4p at *2-3. Here, the ALJ relied on VE testimony that conflicted with the DOT, and the ALJ was therefore required to explain the deviation by making either specific factual findings or drawing inferences from the context of the VE's testimony. *See Light*, 119 F.3d at 793. Instead, the record contains only the VE's conclusion that Plaintiff can perform work requiring "frequent reaching" despite an RFC limiting her to "occasional overhead reaching." "Where an ALJ fails to obtain an explanation for and resolve an apparent conflict – even where the VE did not identify the conflict – the ALJ errs." *Richardson*, 2012 WL 1425130, at * 5. Remand is required to obtain further VE testimony to resolve the inconsistency with the DOT. *Massachi*, 486 F.3d at 1155.

The Court remands this case so the ALJ can apply SSR 00-4p's requirements and determine: 1) whether the jobs identified by the vocational expert are consistent with the definitions in the DOT and Plaintiff's limitations; and, 2) whether there is a reasonable explanation for any inconsistencies between the VE's testimony and the DOT.

**B.     Remand is Required**

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing." 42 U.S.C. § 405(g). In Social Security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Id*. (alteration in original) (internal quotation marks omitted); *see also Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396,

1399 (9th Cir. 1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed." (citation omitted)).  Here, the ALJ erred in relying on the testimony of the VE which is in apparent conflict with the DOT, and remand is appropriate for renewed consideration of this issue.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Donna Lee Stainthorp and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **February 18, 2015**               **/s/ Gary S. Austin**
                                            UNITED STATES MAGISTRATE JUDGE